UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| United States of America, | Case No. 19-cr-325 (MJD/TNL) |
| Plaintiff, | |
| v. | **REPORT & RECOMMENDATION** |
| Brian Marquez Williams, | |
| Defendant. | |

---

Harry Jacobs, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Karlowba R. Adams Powell, 835 Geranium Avenue East, St. Paul, MN 55106 (for Defendant).[1]

---

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Brian Marquez Williams's Motion for Suppression of Unlawful Search, ECF No. 21.[2] This motion has been referred to the undersigned for a report and recommendation

---

[1] While this matter was under advisement, defense counsel was "indefinitely suspended from the practice of law . . . with no right to petition for reinstatement for 120 days," effective May 20, 2020. *In re Powell*, No. A18-1967, ___ N.W.2d ____, 2020 WL 2176994, at *8 (Minn. May 6, 2020) (per curiam). With no appearance yet by substitute counsel, the Court will, out of an abundance of caution, direct that the Clerk of Court mail a copy of this Report & Recommendation to Defendant at the Sherburne County Jail, 13880 Business Center Drive Northwest, Suite 200, Elk River, MN 55330-1692.

[2] Although the title of Defendant's motion refers just to a search, Defendant confirmed at the hearing that he is challenging both the seizure of his person and the search of the Mercedes Benz vehicle, both of which occurred on September 30, 2019. *See* Tr. 4:3-13, ECF No. 35. The Court notes that the period for filing notices of intent to request redaction of the hearing transcript has expired and neither party has indicated that they intend to do so. *See* D. Minn. LR 5.5.

to the district court, the Honorable Michael J. Davis, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was held on February 14, 2020. ECF No. 25. Assistant United States Attorney Harry Jacobs appeared on behalf of the United States of America (the "Government"). Attorney Karlowba R. Adams Powell appeared on behalf of Defendant. Post-hearing briefing is now complete, and this motion is ripe for a determination by the Court.

## II. FINDINGS

The Court heard testimony from Officer Jacob Fliehr of the Inver Grove Heights Police Department. The Government offered and the Court received: Government Exhibit 1, video footage from Officer Fliehr's body-worn camera on September 30, 2019; Exhibits 2 and 3, photos from the interior of a Buick vehicle; Exhibit 4, dispatch audio records from September 30, 2019; Exhibit 5, an audio recording of the 911 call on September 30, 2019; and Exhibit 6, squad car video from September 30, 2019. Defendant offered, and the Court received Defendant Exhibit 1, the recorded statement of the 911 caller/tipster.[3]

Based upon the file and documents contained therein, along with the testimony and exhibits presented, the undersigned makes the following findings.

---

[3] This exhibit was provided to the Court after the hearing by agreement of the parties due to some technical difficulties. *See* Tr. 44:6-47:24, 49:14-50:25. The flash drive submitted to the Court actually contained five recordings: one for the 911 caller; two for Defendant; and two for the driver of the Buick. Because Defendant only offered—and the Court only received—the recorded statement of the 911 caller, the Court has not considered the remaining four recordings.

2

## A. 911 Call

On September 30, 2019, a woman[4] called 911 to report that her boyfriend had pulled a gun on her. Gov't Ex. 5 at 00:10-11. The 911 caller reported that he was traveling in a black Mercedes Benz vehicle, a "car," to a nearby gas station. Gov't Ex. 5 at 00:38-42, 1:38-46, 2:02-09. The 911 caller additionally reported that there was another car, a black Buick, "in front of him." Gov't Ex. 5 at 1:32-35, *see* Gov't Ex. 5 at 1:46-1:49, 2:36-42. The 911 caller reported that there were no license plates on the Mercedes, and the Buick had the word "arrow" in or around the license-plate area. Gov't Ex. 5 at 3:11-53. The 911 caller reported that there was one person in each vehicle, and a Caucasian woman was driving the Buick. Gov't Ex. 5 at 2:56-58, 4:38-48, 4:59-5:04.

The 911 caller reported that there were guns and drugs, which she thought was heroin, in the cars. Gov't Ex. 5 at 1:50-56, 4:50-53. The 911 caller stated that her boyfriend "probably gave [the gun] to the white girl driving the Buick." Gov't Ex. 5 at 2:56-58. When asked by dispatch which vehicle the drugs were in, the 911 caller reported that they were in the Buick. Gov't Ex. 1 at 5:00-04.

The 911 caller stated her boyfriend's name was "Torrell Brown"[5] and identified herself as "Tisha Green." Gov't Ex. 5 at 00:59-1:28; *see* Tr. 37:1-5. Law enforcement later determined that this was not the 911 caller's real name. Gov't's Opp'n at 3, ECF No. 33.

---

[4] The identity of the 911 caller is known to the parties.
[5] The spelling of the first name is not entirely clear from the record. *Compare, e.g.*, Def.'s Mot. at 2 ("Terrell") *with* Tr. 37:4-5 ("Torrell").

3

### B. Law Enforcement Response to the Call

Officer Fliehr is a licensed peace officer with the Inver Grove Heights Police Department. Tr. 6:12-7:10. His responsibilities include patrolling for criminal behavior and responding to 911 calls. Tr. 7:13-16, 8:1-5. Officer Fliehr has been with the Inver Grove Heights Police Department for approximately four years. Tr. 7:11-12.

#### 1. Dispatch Information

Officer Fliehr was one of the officers who responded to "a weapons involved call involving an ex-boyfriend that pointed a pistol at someone." Tr. 8:10-20; *see* Tr. 13:22-14:1, 35:23-36:1; Gov't Ex. 4 at 09-30-19 19.16.42, 09-30-19 19.16.50.[6] Officer Fliehr received the call at approximately 7:00 p.m. Tr. 8:10-23. Officer Fliehr testified that, either through dispatch or electronic call notes, he received information that there were two vehicles involved: "a black Mercedes with no license plate and . . . a black Buick but an unknown plate." Tr. 12:14-19; *see* Tr. 12:20-13:1; Gov't Ex. 4 at 09-30-19 19.17.51. Officer Fliehr also received information that the vehicles had left an apartment complex and were traveling to a nearby gas station. Tr. 13:8-18. The man reported to have pointed the gun was driving the Mercedes, and a woman was driving the Buick. Tr. 14:4-7, 27:14-22, 29:4-7, 12-15. The suspect's name was "Torrell Brown." Gov't Ex. 4 at 09-30-19 19.22.43. Additionally, Officer Fliehr received information "that both vehicles potentially had drugs and guns inside of them." Tr. 14:8-11; *see* Gov't Ex. 4 at 09-30-19 19.18.06; *see also* Gov't Ex. 1 at 1:06-14, Gov't Ex. 6 at 1:08-16. Officer Fliehr testified that he did

---

[6] At the hearing, Officer Fliehr testified that a separate audio clip is created "[e]very time the radio button is basically pressed . . . ." Tr. 10:2-4.

4

not listen to the 911 call before arriving on scene and the information he received was from dispatch. Tr. 36:2-7, 20-23, 40:11-20.

### 2. At the Gas Station

Officer Fliehr arrived at the gas station, where he "immediately noted there was a [black] Mercedes on the right side of the pump" and "a [black] Buick between the two sets of pumps." Tr. 14:16-18; *see, e.g.*, Gov't Ex. 1 at 1:46-54; *see also* Tr. 16:16-20, 28:8-12. The driver's door of the Mercedes was open. Tr. 14:19, 28:8-12, 30:2-4; *see, e.g.*, Gov't Ex. 1 at 1:46-54. Officer Fliehr observed two people in the Buick: a female driver and Defendant, who was in the front passenger seat. Tr. 30:16-31:16. Officer Fliehr observed Defendant "st[and] up from the passenger side of the Buick." Tr. 14:23-15:2; *see, e.g.*, Gov't Ex. 1 at 1:46-54; *see also* Tr. 16:21-23; Gov't Ex. 6 at 1:52-55. Officer Fliehr testified that he did not observe anyone in the Mercedes. Tr. 29:21-24; *see* Tr. 31:17-23.

Law enforcement gave Defendant a series of commands to put his hands up and walk backwards. Tr. 15:1-6; *see, e.g.*, Gov't Ex. 1 at 1:53-3:16. Defendant did not comply with their commands. Tr. 15:7-8. Law enforcement continuously had to tell Defendant to keep his hands up. Tr. 15:13-14; *see, e.g.*, Gov't Ex. 1 at 1:53-3:16. Defendant "repeatedly would put his hands up at about where his elbows were even with his shoulders and his hands were just about right where his head was, and then he would drop them down." Tr. 15:10-13; *see, e.g.*, Gov't Ex. 1 at 7:24-25 (describing Defendant as "reaching into his waistband"); *see also* Tr. 17:3-21, 38:18-24. At one point, Defendant "reache[d] down, . . . kind of . . . lean[ed] in towards the car, reach[ed] into . . . either his waistband or into his pockets, and . . . ma[de] another furtive motion into the car." Tr. 19:17-20; *see* Gov't

5

Ex. 6 at 1:56-3:30. Officer Fliehr testified that he was concerned for his safety when Defendant returned to the Buick and "made that furtive motion" while law enforcement was trying command him to walk backwards towards them, considering they were "responding to a weapons call where someone had just pointed a weapon at someone." Tr. 38:25-39:9, 41:1-7. "[I]n that moment when [Defendant] reached down for his waistband, [Officer Fliehr] was afraid that [Defendant] was going to pull out a gun." Tr. 41:5-7.

Officer Fliehr testified that Defendant "didn't respond like anyone [he] had ever dealt with before"; Defendant "was very cool, calm, [and] collected . . . even with the heightened state of . . . the felony stop." Tr. 19:21-25. Officer Fliehr testified that, based on his training and experience, this was significant because law enforcement officers are "trained that when you have someone that is that cool, calm and collected . . . that they're being very precise about what they're doing. They've already thought about how to react in that situation and that they could be assaultive in nature." Tr. 20:1-7; *see* Gov't Ex. 1 at 34:14-41.

As he was being handcuffed, Defendant can be heard telling law enforcement that his name is "Brian." Gov't Ex. 1 at 3:38-39. After Defendant was secured, law enforcement secured the driver of the Buick, a Caucasian woman. Gov't Ex. 1 at 3:57-4:20; *see* Tr. 20:8-13.

Law enforcement searched the Buick first. Gov't Ex. 1 at 6:12-13:08; *see* Tr. 20:8-15. In the vehicle, they found, among other things, a bag of heroin sitting on the driver's seat, a wad of cash next to a pill bottle in the center console, and two scales. *See, e.g.*, Gov't Ex. 1 at 7:33-45; Gov't Exs. 2, 3; *see also* Tr. 20:22-22:25, 24:2-18. Officer Fliehr

6

testified that these items were significant based on his training and experience because it is "commonplace to see people that are trafficking narcotics to also have wads of cash." Tr. 23:1-7.  It was also significant "that there were multiple scales, a large bag of heroin and cash all within close proximity to the driver." Tr. 23:8-13.  Officer Fliehr testified that he was able to see the bag of heroin from outside the vehicle.  Tr. 40:21-25, 42:4-7.

Law enforcement then searched the Mercedes.  Gov't Ex. 1 at 15:46-19:36, 20:15-24, 59:36-1:26:39.  In this vehicle, they found, among other things, a gun, more heroin, more pills, and other drug paraphernalia.  Gov't Ex. 1 at 20:15-50, 59:36-1:26:39; *see* Tr. 24:19-26:22, 32:6-19, 33:9-20.  Officer Fliehr agreed on cross examination that the search of the Mercedes took place after Defendant had complied with law enforcement and was no longer making "furtive motions" or reaching "towards the waistband."  Tr. 39:15-24.

### C. 911 Caller's Recorded Statement

That evening, law enforcement subsequently obtained a recorded statement from the 911 caller around 9:30 p.m.  Def.'s Ex. 1 at 00:00-13; *see* Tr. 50:14-16.  Among other things, the 911 caller stated that the Caucasian woman and Defendant were initially together in the Buick before separating into two cars and the Caucasian woman was driving.  *See, e.g.*, Def.'s Ex. 1 at 00:00-2:22, 2:38-44   The 911 caller saw the Caucasian woman hand Defendant the gun and then he got out of the Buick.  *See, e.g.*, Def.'s Ex. 1 at 1:11-20, 2:07-08, 2:44-48, 3:13-17, 3:29-51.  The 911 caller also believed that the Caucasian woman "gave [Defendant] something" before they drove off in separate vehicles.  Def.'s Ex. 1 at 3:56-4:04.

7

### III. CONCLUSIONS OF LAW

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. Defendant challenges both the seizure of his person and the warrantless search of the Mercedes under the Fourth Amendment.[7] Based upon the foregoing findings, the undersigned makes the following conclusions of law.

**A. In the Buick vs. In the Mercedes**

At the hearing, Defendant proffered the recorded statement of the 911 caller "as rebuttal evidence for the purpose to prove that the 911 caller . . . very specifically says in that recorded statement that the drugs and the gun were in the Buick." Tr. 49:20-50:1. In his post-hearing memorandum, Defendant similarly states that "[n]ot only did the 911 caller initially tell police dispatch that the drugs and the gun were in the car, she told officers again in a recorded statement that the drugs and the gun were in the Buick." Def.'s Mem. in Supp. at 5.

The 911 caller told dispatch that her boyfriend had pulled a gun on her and then drove off in the Mercedes. Gov't Ex. 5 at 00:00-43. As the dispatcher tried to get more information, the 911 caller reported that "it's two black cars following each other" and "there's guns and drugs in the car [singular]." Gov't Ex. 5 at 1:46-51. The dispatcher repeated back for verification: "Two black cars following each other and they have guns

---

[7] *See supra* n.2. The Court additionally notes that, notwithstanding Defendant's repeated references to the warrantless nature of the search, there are also several requests to review a warrant for probable cause. *See, e.g.*, Def.'s Mot. at 1-2 ("On September 30, 2019, no search warrant was obtained by law enforcement for the search of the trunk of the Mercedes from a judge. Without a warrant law enforcement searched the trunk of the Mercedes. Mr. Williams asserts that this search was carried out in violation of his Fourth Amendment rights under the U.S. Constitution. Mr. Williams requests that the Court review the warrant for probable cause."); *see also* Def.'s Mot. at 2; Def.'s Mem. in Supp. at 2; Tr. 48:14-16. There is no warrant before the Court.

and drugs in the cars [plural]?"  Gov't Ex. 5 at 1:52-55.  The 911 caller responded, "Yep." Gov't Ex. 5 at 1:56.

When the dispatcher asked for more information about the gun, the 911 caller reported that her boyfriend "probably gave it to the white girl driving the Buick."  Gov't Ex. 5 at 2:47-59.  The dispatcher also asked for more information regarding the drugs.  *See* Gov't Ex. 5 at 4:50-5:04.  The dispatcher asked the 911 caller, "And which car has the drugs in it—the Buick or the Mercedes?"  Gov't Ex. 5 at 4:59-5:02.  The 911 caller responded, "The Buick with the white girl."  Gov't Ex. 5 at 5:03-04.

Officer Fliehr testified at the hearing, however, that he had not listened to the 911 call.  Rather, the information he received was from dispatch.  As Officer Fliehr testified at the hearing and can be heard on the squad video of the officers responding to the call, dispatch relayed to the officers that the 911 caller was "saying that there's two black cars following each other and they both have guns and drugs in the vehicle, vehicles."  Gov't Ex. 4 at 09-30-19 19.22.43; *see* Gov't Ex. 1 at 1:06-14, Gov't Ex. 6 at 1:08-16; *see also* Tr. 14:8-11.  "Mistakes of law or fact, if objectively reasonable, may still justify a valid stop.  In mistake cases the question is simply whether the mistake, whether of law or of fact, was an objectively reasonable one."  *United States v. Williams*, 929 F.3d 539, 544 (8th Cir. 2019) (quotation and citation omitted); *accord United States v. Lopez-Tubac*, 943 F.3d 1156, 1160 (8th Cir. 2019).  Any mistake by dispatch in relaying that there were guns and drugs in both vehicles was objectively reasonable based on what transpired during the 911 call.

9

More than two hours later, during a recorded statement with law enforcement, the 911 caller stated that she saw the Caucasian woman hand the gun to Defendant while they were in the Buick together before they separated into two vehicles. *See, e.g.*, Def.'s Ex. 1 at 1:11-2:10, 2:38-44, 3:13-42. The 911 caller also stated that she saw the Caucasian woman give Defendant "something." Def.'s Ex. 1 at 3:59-4:04. These after-fact-statements, in which the 911 caller offered more information and provided greater detail than she had before when speaking with dispatch, do not alter the objective reasonableness of the information relayed by dispatch to the law enforcement officers at the time the officers responded to the call. *See Williams*, 929 F.3d at 544 (determination of objective reasonableness "is not to be made with the vision of hindsight, but instead by looking to what the officer reasonable knew at the time" (quotation omitted)).

### B. Seizure & Arrest of Defendant

Defendant argues that the seizure of his person on September 30 was conducted without a warrant, not based on probable cause, and not the result of exigent circumstances. Defendant argues that even though the 911 caller reported that "Torrell Brown" was the name of the person who pointed the gun at her, law enforcement seized and arrested him. The Government maintains that the seizure of Defendant was supported by both reasonable suspicion and probable cause.

#### 1. Reasonable Suspicion to Detain

"A law enforcement officer may detain a person for investigation without probable cause to arrest if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Green*, 691 F.3d 960, 963 (8th Cir. 2012)

10

(quotation omitted). "Reasonable suspicion exists when an officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Lopez-Tubac*, 943 F.3d at 1159 (quotation omitted). "Reasonable suspicion requires less than probable cause of criminal activity, but the suspicion cannot be based on an inarticulate hunch." *United States v. Lowry*, 935 F.3d 638, 641 (8th Cir. 2019) (quotation omitted).

"[A] person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect, can support a finding of reasonable suspicion." *United States v. Quinn*, 812 F.3d 694, 698 (8th Cir. 2016); *accord Lowry*, 935 F.3d at 641. So too can a person's "behavior when [he or she] become[s] aware of the officer's presence." *Quinn*, 812 F.3d at 698; *accord Lowry*, 935 F.3d at 641. Courts "assess whether a law enforcement official had reasonable suspicion of criminal activity based on the totality of the circumstances, keeping in mind that officers may draw on their experience and training to make inferences from the information they have." *Lopez-Tubac*, 943 F.3d at 1159 (quotation and citation omitted).

"As the Supreme Court has made clear, '[when] an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity.'" *United States v. Manes*, 603 F.3d 451, 456 (8th Cir. 2010) (alteration in original) (quoting *Alabama v. White*, 496 U.S. 325, 331 (1990)); *see also Illinois v. Gates*, 462 U.S. 213, 244 (1983) ("Because an informant is right about some things, he is more probably right about other facts." (quotation omitted)). "An informant may . . . prove [him or her]self to be a reliable source

11

for law enforcement by providing predictive information about a meeting time or place." *United States v. Winarske*, 713 F.3d 1063, 1067 (8th Cir. 2013); *accord United States v. Harry*, 930 F.3d 1000, 1006 (8th Cir. 2019); *see also United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir. 1995) ("Independent verification occurs when the information (or aspects of it) is corroborated by the independent observations of police officers."). "Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities." *White*, 496 U.S. at 332; *accord Harry*, 930 F.3d at 1006.

Here, the 911 caller's tip included both descriptive information regarding the vehicles and their drivers as well as predictive information about the vehicles' location. "The information was specific rather than generic and therefore unlikely available to someone without reliable insight into [Defendant's] activities." *Harry*, 930 F.3d at 1006. Law enforcement had received information from the 911 caller that a man had pointed a gun at the caller; the man left the scene driving a black Mercedes with no license plate; the man was traveling with another vehicle, a black Buick being driven by a woman; the two vehicles were headed to a nearby gas station; and the vehicles potentially had drugs and guns in them. When law enforcement arrived at the specified gas station, they observed a black Buick and black Mercedes parked in close proximity to one another; the driver's door of the Mercedes was open; a man and a woman were sitting in the Buick; and the woman was in the driver's seat. Therefore, the Court concludes that, under the totality of the circumstances, law enforcement had reasonable suspicion to believe that criminal activity

may be afoot—namely, Defendant's criminal threat with a gun and possession of heroin—and detain Defendant upon their arrival. *See id.*

### 2. Search of the Buick

Defendant does not challenge the search of the Buick. Nor does he challenge the length of the stop. Defendant had been sitting in the Buick just prior to the arrival of law enforcement. *See Lowry*, 935 F.3d at 641; *Quinn*, 812 F.3d at 698. They observed him sitting in and subsequently existing the Buick's front passenger seat. *See Lowry*, 935 F.3d at 641; *Quinn*, 812 F.3d at 698. As law enforcement attempted to detain Defendant, he resisted their commands and persisted in lowering his hands out of sight, including but not limited to the area around his waistband. *See Lowry*, 935 F.3d at 641; *Quinn*, 812 F.3d at 698. Defendant's demeanor was also unusually calm for the heightened circumstances of the stop. *See Lowry*, 935 F.3d at 641; *Quinn*, 812 F.3d at 698. Officer Fliehr credibly testified that, based on his training and experience, this type of behavior is concerning from a safety perspective because it indicates that the subject individual has contemplated an encounter with law enforcement and considered how he or she might respond, and may become assaultive. *See Lopez-Tubac*, 943 F.3d at 1159.

Considering the collective totality of (1) the existing reasonable suspicion regarding Defendant's criminal threat with a gun and possession of heroin; (2) Defendant's presence in the Buick when law enforcement arrived; (3) Defendant's behavior when interacting with law enforcement; and (4) the training and experience of law enforcement regarding the behavior exhibited by Defendant, there was a sufficient basis to search the Buick after Defendant and the driver were secured. *See Harry*, 930 F.3d at 1006.

### 3. Probable Cause to Arrest

"The more rigorous standard of probable cause exists when the totality of the circumstances justifies the belief that a crime has been committed and the person being seized committed it." *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008). "A warrantless arrest by law enforcement is reasonable where there is probable cause to believe that someone has committed or is committing a crime." *Winarske*, 715 F.3d at 1066 (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)); *see also Draper v. United States*, 358 U.S. 307, 310 (1959) ("The crucial question for us then is whether knowledge of the related facts and circumstances gave Marsh probable cause within the meaning of the Fourth Amendment . . . to believe that petitioner had committed or was committing a violation of the narcotics laws." (quotation and footnote omitted)).

Reasonable suspicion "rise[s] to the level of probable cause when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *United States v. Patrick*, 776 F.3d 951, 955 (8th Cir. 2015) (quotation omitted). "Arresting officers are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest." *Winarske*, 715 F.3d at 1067. "To determine whether an officer had probable cause for an arrest, [courts] examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quotation omitted).

14

"Probable cause is a practical and common-sensical standard that is based on the totality of the circumstances and requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017) (quotation omitted). "In reviewing the law enforcement officers' determination of probable cause, [courts] look at the totality of the circumstances and give due weight to the inferences that can be drawn from the officers' experience." *United States v. Roberson*, 439 F.3d 934, 939 (8th Cir. 2006). In the end, "[p]robable cause 'is not a high bar.'" *Wesby*, 138 S. Ct. at 586 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *Id.* (quoting *Gates*, 462 U.S. at 243-244, n. 13).

As stated above, Defendant has not challenged the length of the stop. It took law enforcement approximately two minutes to secure Defendant. It took approximately another minute and a half to secure the female driver of the Buick. Once Defendant and the driver were secured, another approximately two minutes elapsed while law enforcement secured the scene, went to look for the gun in the Buick, and discovered the bag of heroin on the driver's seat. Thus, in less than ten minutes, law enforcement's investigation into their reasonable suspicion of Defendant's criminal threat with a gun uncovered evidence of illegal narcotics in an area where they had observed Defendant just moments before.

The discovery of suspected heroin on the driver's seat of the Buick combined with the totality of the circumstances described above gave law enforcement probable cause to

believe that Defendant had committed a narcotics crime and arrest him without a warrant. The fact that Defendant's name was not "Torrell Brown" does not materially alter the conclusion an objectively reasonable police officer would draw from these facts. *Cf. Patrick*, 776 F.3d at 956 ("When arrested, Patrick's identity was irrelevant—the officers reasonably suspected this man had contraband regardless whether he was the man they had thought he was.").

### C. Search of the Mercedes

Defendant argues that the search of the Mercedes was improper because it was not supported by probable cause and the officers did not obtain a warrant before conducting the search. Defendant focuses on the fact that he and the female driver were already in custody at the time the Mercedes was searched and "any perceived danger had been eliminated once the search of the Buick was concluded." Def.'s Mem. in Supp. at 4. Defendant also reiterates that the 911 caller reported that the gun and drugs were in the Buick, not the Mercedes.

"Under the 'automobile exception' to the Fourth Amendment, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Winarske*, 715 F.3d at 1068. This includes the trunk and containers in the vehicle. *See, e.g.*, *Arizona v. Gant*, 556 U.S. 332, 347 (2009) ("If there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820-21 (1982), authorizes a search of any area of the vehicle in which the evidence might be found." (citations omitted)); *United States v. Walker*, 840 F.3d 477, 483 (8th Cir. 2016) (trunk); *United States v. Brooks*, 715

16

F.3d 1069, 1075 (8th Cir. 2013) (containers). "Probable cause for a search under the automobile exception exists if the facts and circumstances known to the officers when they began the search were sufficient in themselves for a person of reasonable caution to believe that contraband or evidence of criminal activity was present in the vehicle." *Walker*, 840 F.3d at 483.

Although law enforcement had not observed Defendant in the Mercedes prior to the search, there was probable cause under the totality of the circumstances to believe that the Mercedes contained contraband (heroin) or other evidence of a crime (the gun that had been used to threaten the 911 caller). The information provided by the 911 caller, which formed the basis of law enforcement's reasonable suspicion that criminal activity was afoot, linked the Buick and Mercedes together. The vehicles were traveling together to the same gas station, each with a single driver of the opposite sex. When law enforcement arrived at that gas station, the vehicles were in close proximity to one another. The driver's door of the Mercedes was open, and no one was inside the vehicle. There were, however, two people in the Buick—a female driver and Defendant, a male, who was sitting in the front passenger seat.

Again, probable cause is not a high bar. *Wesby*, 138 S. Ct. at 586. The connection between the two vehicles combined with the observations of law enforcement upon arrival and the discovery of heroin in the Buick in an area where Defendant had been observed provided probable cause to believe the Mercedes contained contraband or other evidence of a crime, irrespective of which vehicle the 911 caller may have identified as containing

17

the drugs and gun. Accordingly, pursuant to the automobile exception, no warrant was required to search the Mercedes.

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion for Suppression of Unlawful Search, ECF No. 21, be **DENIED**.

Date: May __12__, 2020                                *s/ Tony N. Leung*
                                                      Tony N. Leung
                                                      United States Magistrate Judge
                                                      District of Minnesota


                                                      *United States v. Williams*
                                                      Case No. 19-cr-325 (MJD/TNL)


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.